nors, I'm sorry, Voice of America. Yes, sir. Good morning, Your Honors. May it please the Court. My name is Wayne Jones, and I'm here representing the plaintiff in this matter, Mr. Robert Namer. This case presents one critical question that must be answered in conformance with the Constitution, and that is, who is the voice of America? Now, in most cases, that might be considered a rhetorical flourish, you know, a bit of symbolism, but here it is literally the question. And the reason for that is that the defendant in this matter, the Voice of America, I'm going to refer to them as Voice of America because the institution overseeing them changed so much over the years. All right. So who the Voice of America is goes directly to the nature of the defendant, the Voice of America. They were created originally towards the end of World War II as a propaganda arm to reach into Nazi-occupied Germany. After the war, it evolved to become an outreach program to try and reach behind the Iron Curtain. It was always an internationally focused endeavor. It was always about diplomacy and representing, basically, the views of the American administration. The first statute that enabled the Voice of America was the Smith-Munn Act of 1948. There were a number of concerns that came up when the suggestion was made that the government should have its own information dissemination system, and radio broadcasting alike. Private radio broadcasters were concerned that the market would be crowded out. In other words, if the government were allowed to be the one generating speech, that private speech would be silenced just by their presence. The second concern was that they didn't want domestic propaganda to be the result of the Voice of America program. The Smith-Munn Act addressed both concerns. With regard to the government crowding out private endeavors, the Act stated specifically that if there was an equivalent private information dissemination service, that the government had to reduce its own activities to that extent if it was found to be adequate. Now, that goes back to the beginning, 1948. It's always been there. It's been in subsequent versions of the statute. The second way they addressed the concerns was that there was a de facto ban on domestically putting out the information that Voice of America was kept to an international audience and prevented from directly speaking to the American public. The reason why that has bearing here, and the reason why Mr. Namer's First Amendment and Fifth Amendment rights are implicated, is that all of the arguments that the BBG makes are constrained by statute. They're an agency. They only have the powers given to them by Congress. Unlike my client, who is a private citizen and has natural rights just by virtue of being alive, they're an agency that has to be given certain powers, and they have to act within the bounds of those powers. They've demonstrated a course of conduct prior to this litigation and throughout this litigation that directly violates their own statute. First of all, let's consider their first contact with Mr. Namer. In 2000, they wrote a letter to Mr. Namer complaining that he had a radio program where he was using Voice of America and the initials VOA on the air. The letter claimed that that was in violation of statute and that Mr. Namer had to defer to them. Now, that was legally improper in two senses. First of all, they claimed rights that they didn't have because they had no statutory right for them to say that they had the name. Any rights they had were common law. Secondly, it violated the statute in that they were not deferring to an equivalent private information service provider. They were, in fact, telling the information service provider to move out of the way in their favor. The First Amendment has always been in play in this because when you look at the pleadings filed by the BBG, when you look at the evidence they submitted, their concern has always been that they don't want Mr. Namer's opinions attributed to them. I think they said they'd be fine with changing the website to namersvoiceofamerica.com and he can engage in all the speech he wants, asking his commenters. What's the problem with that? Respectfully, Your Honor, the URL itself is speech. The case law establishes that a URL is analogous to a title of a book and if it's an expressive act, which of course the website itself is expressive, then the title is part of that expression. They've established that the fact that there are available alternative titles is not the issue. The issue, which is discussed in Rogers v. Grimaldi, which this Court followed in Westchester, is whether or not there's any connection between the title and the content. In other words, is there a creative link between the two? Now him calling himself the voiceofamerica.com goes to everything that he had been doing back to 1968. You know, when he first started making public appearances and appearing on the radio and printing pamphlets and appearing on television under the moniker the Voice of America. In 1991, he began his own radio program under that same name. In 1998, he opened his website thevoiceofamerica.com. So all of that is expression and the voiceofamerica.com, being the URL, is part of the expression that he had been doing since 1968. So him having to change the title in and of itself constrains his First Amendment rights. That's true anytime there's a trademark infringement found. I'm sorry? If I can't open a store tomorrow called, our last case was Macy's, I can't open a store tomorrow called Macy's because that would infringe their trademark. That is an infringement on my speech, but you're basically saying trademark law is unconstitutional. Respectfully, Your Honor, that would not be the way I would characterize our contentions. If you look at the line of cases, Rogers v. Grimaldi, this Court followed it in Westchester and in Sugar Busters, what they're saying is that you have to apply it narrowly so that you don't overstep. You're trying to balance the interest in speech, which is fundamental to the Constitution, and also it's for the good of the public, against the interest of consumer confusion, which is what the Lanham Act is designed, you know. And that Rogers test you're talking about, I've seen it applied. It talks about what cases apply it to the name of a website. A case that applied it to the name of a website would be protectmarriage.com was one of them. We cited in our brief, and what is the other one? I have to admit, I'm spacing a little bit on the second one. We cited a number of cases with regard to the URL being speech itself. And logically, if you think about it, even if a case hadn't directly addressed that point, which we contend that it has, and it's in our brief, even if the case hadn't directly addressed that, it's the only thing that makes any sense. Because if the title of a movie or the title of a book is speech that's protected, and you can't force somebody to change it, you know, in abrogation of their First Amendment rights, then the title of a logical reason to treat those two issues inconsistently. You know, but the thing with Rogers and all the cases that follow it, including Westchester, including Sugar Busters, is that, again, they speak to the constitutional concerns that have to be taken into account. Even more so in this case, because the BBG is not an ordinary litigant. The BBG, as a creature of statute, has to constrain its activities, not only within the Constitution, but within its own statute. And we would submit that the fact that they have to defer to the private market, which is a point that they waived, because they didn't brief it in their appellee's brief. You know, the fact that they have to defer to the private market goes to the free speech issue. You know, they have to move out of the way so that speech by private actors is protected. You know, so the First Amendment has always been at the core of this case. When you look at the fact that they cite their own, their own charter in their pleadings, and you know, they cite the content concerns that they have, all of that brings up the First Amendment, because the nature of what they're doing is speech. Where did you raise this Rogers First Amendment argument in the district court? Because the judge didn't address it? Well, this is the way that it comes up. First of all, we would argue that the First Amendment has always been in play just by the nature of what they submitted on summary judgment, their own declaration. Think of Mr. Silver. Let me ask the question a little more directly. Did you cite the Rogers case in any filing with the district court? We cited Westchester, which What filing? What filing was that? That was in our opposition to summary judgment. Furthermore, the defendants themselves cited Westchester, and the court cited Westchester. Now, that's significant because Westchester deals with that balancing issue between the First Amendment and the Lanham Act. You know, in Westchester, it was a polo magazine that was at stake. There was a putting out basically a niche interest magazine for people who played polo, and they got into a dispute with Ralph Lauren's company, who manufactures polo clothing and cologne and the like, you know, and one of the issues that was in play was the extent to which they had the right to call their magazine polo. You know, so that was in the case that was cited by all the parties and cited by the court. So the First Amendment and Rogers was right there in it. Furthermore, in our opposition to summary judgment, we discussed the fact that the BBG's conduct was designed to chill Mr. Namer's speech. You know, by the fact that they're trying to be the only voice of America, they are acting against the First Amendment. By the fact that they are trying to put in unity when, in fact, it implicates the First Amendment. You know, I mean, if you look at, there's this dichotomy between the international and the domestic. Internationally, the American government speaks with one voice. America speaks with one voice through the State Department. Domestically, there can't be one voice, you know, for any number of reasons. Popular sovereignty, federalism, you know, there's a multiplicity of voices, which is part of what the First Amendment is about, is creating, preserving, protecting, extending that marketplace of ideas. You know, so there can't be any one voice of America. There's not even one America. You know, federalism breaks it down into all these constituent parts that interrelate, you know, to some extent independently, to some extent subserviently, depending on the issue you're talking about. You know, it's a heterogeneous society. It's designed to have a diversity of voices speaking. All of that goes to the First Amendment, you know, and that's the core issues that we enunciated in our opposition to summary judgment. Further, what we would submit is that the animating issues that we talked about in terms of federalism and pluralism, you know, and popular sovereignty and the like, these are the same issues that drove Congress when they were crafting the Smith-Mundt Act. When you look at the legislative history, they talk about these concerns about the role of government in putting out information, the role of government in speech. You know, furthermore, the due process aspect of it, which we raised in our opposition to summary judgment, has to be in play. It has to be in play because an agency can't violate its statute. If it does, it's an ultra-virus act and it's void as a What that means is that all the issues that we brought out in our opposition to summary judgment tie in directly to the statutory concerns that were further elaborated on appeal. Now, furthermore, if the court were inclined to say that we had not raised the issue adequately at the district court level, we submit that this case presents extraordinary circumstances in the sense that the questions presented on appeal are pure matters of law. They don't rely upon the factual record below, and more importantly, a manifest injustice would result if the court were not to take the issue up and address it. You know, I mean, one of the main purposes of Article III courts is to oversee the constitutionality of the government's actions. It's a manifest injustice if he has to say Nehmer's voice of America instead of voice of America? It's a manifest injustice if the government is allowed to violate a statute and then reward it for it. You know, because part of the problem is that there are violations of statute. They're not seeking any damages. I'm sorry? They're not seeking any damages. They're seeking to constrain his speech. They're seeking to, they're seeking an injunction, but. But the injunction has the effect of constraining speech. Respectful. You know, I mean, the main thing to keep in mind here is that anytime you let an agency benefit from violations of the law, you are committing injustice. You know, the prior use defense that we asserted and didn't waive depends upon the fact, in part, that they couldn't establish priority over us as a matter of law. They couldn't be in the United States market. Our time is reserved for rebuttal. Thank you, Your Honor. Thank you, sir. Mr. Ruddy. May it please the court, David Ruddy from the Department of Justice on behalf of the appellees. This case presents the unexceptional question of whether the website, thevoiceofamerica.com, infringes the registered service mark, the Voice of America. The trial court answered that question as yes, describing the result as especially clear. And we asked this court to affirm that conclusion. Mr. Namer's appellant's brief raises a number of issues, but only two are properly before this court because of the doctrine of waiver. That's the issue of latches. And the second is the Daubert challenge to Dr. Isaacson's survey report. Those are the only two issues that were properly raised below and were addressed by the district court. But since the First Amendment was discussed and since Your Honor asked a question about it, I'll address that context. The Rogers case was never brought up below. It was never addressed. The district court referenced the Westchester Media case, and that case does follow the Rogers case from the Second Circuit. The Westchester Media case explains, though, when there is a First Amendment issue implicated for a literary title, the likelihood of confusion, the traditional likelihood of confusion test is applied, but it must be particularly compelling to outweigh the First Amendment interest at stake. And we would submit, and we raise this in our brief, that the trial court's finding of especially clear infringement meets that standard, certainly. But also, in this court, the Fifth Circuit has never addressed this point. There is an exception that other courts have found for the Rogers. It's directly in the Rogers case from the Second Circuit. It's in Note 5 from that case that says, the Rogers test does not apply to misleading titles that are confusingly similar to other titles, saying the public interest in sparing confusion, consumers' confusion, outweighs the public interest. And that's why, in our brief, we make the same point, the example you used with Macy's. Mr. Nehmer can't rely on the First Amendment to open a store called Macy's, neither can he operate a website under the First Amendment, you know, called the New Republic, is an example we used, or National Review, or the Times-Picayune, or the Washington Post. So under the Rogers test, there's an exception there, and we feel that we meet that exception. But as to the issue of lashes, the point that the trial court relied on, and we argued over and over below, was that there was no evidence of any prejudice. There was no economic prejudice disclosed, and the court realized that there was never any documentation of any kind of economic evidence for any kind of prejudicial reliance. And that's why we rely on the Pennzoil-Quaker State case just from earlier this year, or last year, I think, from the Fifth Circuit, that explains that you need to prove, for prejudicial reliance, some form of business expansion or business improvement over the period of alleged delay. And we asked Mr. Nehmer over and over during discovery to produce documents about his discovery, and he refused. And in fact, this is in the record at 683, in response to discovery, he explained that there was, he alleged that there was, it was irrelevant. Economic information has no bearing on the claims asserted in this case, according to his discovery responses. So we tried over and over and got no documents at all concerning economic information. But his website is in the record. It's got a lot of advertisements on it. I mean, during this period, he did develop the website, because you knew about him even before he had the website, and he was using Voice of America, you being the government. Well, yes, Your Honor. But for the court, case law is clear, and under that Pennzoil case, he needs to prove some version of some financial revenue to prove a business expansion. But to the point that we knew about him, the only evidence in the record, and we don't dispute this, is that there was a letter in November of 2000 that referenced, it was exclusively directed to his radio programming, and the record was directed to Mr. Namer of WTIX Radio, and explained, it's been brought to our attention that you may be using the name Voice of America and the initials VOA in connection with the radio program you produce. Now, there's evidence in the record that his radio program ended in 2005, and that's in the record at 711 to 712 from Mr. Namer's deposition. Now, we, the record shows that we weren't aware of the website until 2011, and we moved very quickly through the UDRIP proceedings, and now through the district court proceedings, after Mr. Namer filed a D.J. action against us. We counterclaimed for traditional trademark infringement because we have a registered service mark, and that mark is incontestable at this point. And so, again, to point out, we are not seeking any kind of economic relief or damages from, although the Lanham Act allows such provisions, we are seeking for an injunction to remove the confusion. The bigger point being, Mr. Namer can say whatever he wants on his websites, so long as it's clear it's not my client. And we've submitted an example of what we think would not be confusing, but outside of that, if Mr. Namer refuses, we're seeking the injunction, and we got the injunction. We asked this court to affirm that injunction based on the finding of all the evidence of confusion we presented in summary judgment, and there was no genuine issue of fact in response to that. You said the district court found that it was especially clear or something along those lines. I've got a copy of the website right here in front of me. Along the top, there's a Hallmark ad, an Intel ad, a Delta ad. Along the side, you've got Enterprise Car Rental, Delta, Discover Card, Walmart, Target, Dollar Rent-A-Car. Would someone really think that's a government website and there's links to commercial sites? It also doesn't have a .gov. It's a .com. So why would someone think that's an official government website? I mean, just from looking at it, I know there's all these other factors, but just looking at it, it really doesn't seem like someone would think that's the official foreign policy state, you know, propaganda network of the federal government. Well, two points to respond to that. First, Your Honor, there's a line of cases that refer to the talk about the significance of the domain name itself. And so there's also an initial interest confusion that they talk about just the actual name of the domain being identical to the service mark we have here being significant. And that's referenced in the PETA case from the Fourth Circuit, where the website, once you got to the website in that PETA case, we reference it in a footnote and we talk about another Fourth Circuit case in our brief. But in the PETA case, it was the identical website. It was PETA.org. And once you clicked through, it was the accused infringer argued a parody defense. And the case was decided on the parody defense for a different reason. But the point of the Fourth Circuit case was saying there was initial interest confusion just in the name of the domain name. But as to the content of the website, we agree there is, we can't dispute that there's advertising there, but we're the only party who produces any evidence of actual confusion through the survey of Dr. Isaacson. And again, going back to Mr. Namer's conduct and discovery, we asked him if there was any evidence of actual confusion. Have you ever received an email confusing your website with our organization? Again, no documents were produced. And in fact, in response to that discovery, Mr. Namer argued that we were the ones who had that information in our possession. And that just doesn't meet any kind of logical, reasonable test, because there's no reason we would have anything to do with ours. He produced no information about any kind of communications one way or the other. So that's the distinction we make. And even in that Radiance case we distinguish, the point they made clear, the First Amendment was implicated in that Fourth Circuit case, they made clear that the difference between the PETA case and I submit this case, that it was the identical website in the domain name. And it's that initial interest confusion on top of the other evidence. Now, the survey evidence was only challenged below, and this is again from the trial court's opinion, this is in the record at 1555, explaining that Mr. Namer preferred instead to place all his proverbial eggs in the basket of challenging the relevance of the survey commissioned by the defendants. I sent them last week to the, what's the name of that place? Can you turn up your sound a little? We can't hear you. I'm sorry. It's not coming through. We can't understand what you're saying. It's breaking up. Maybe you should try to call us back on a new call. Maybe it'll come through better. I'm sorry. I don't think any of us can understand. It's electronically breaking up, I believe. I'll just move on to, if I could continue addressing the survey evidence. The point was raised. I think there's a couple more. The original checkbook made out. I think you're going to have to hang up and call back and try to get a clear channel. We can't hear you. We can't understand. Thank you, Your Honor. Just to continue with the point about the survey evidence. That was challenged on appeal, and the point was brought up about a common sense type argument, and it was based on some of the similar points about who would confuse this with a government website. And aside from initial interest confusion I brought up, it was a re-arguing of the eighth confusion factor. And the eighth confusion factor talks about the degree of care exercised by potential purchasers. Now, there was no contrary expert evidence offered. Again, all the eggs in the proverbial basket were challenging the survey evidence. But the point we wanted to bring up was in the Internet context, there were a number of cases we cited in our brief that make clear that when you have an offering that is free, confusion is more likely. And there's a case that we talk about where it was Buckeye Illustrated. That was a Thomas case, a district court case from Ohio, where someone was using the Ohio State Buckeye trademarks on a website called Buckeye Illustrated. There's another case we talk about with Audi. There was a local Audi dealership who was using the Audi trademarks. And again, people made the same argument that Mr. Nehmer is making about this website, saying online there's a different context here. This is not Diamonds. This is not Rolls Royces. People are getting this product for free, and for that reason confusion is more likely. But again, these were all issues that were not raised below, so it's almost a hypothetical argument we're raising for the first time. If they were raised below, that's how we would have responded. In, you know, reaffirming the survey evidence provided by Dr. Isaacson, there was no contrary evidence. And secondly, in the Internet context, this has seemed to be clear confusion. And that's the point where, even to the latches argument, so where there's particularly compelling confusion that outweighs the First Amendment interests, that's the test for the Westchester media. Again, there's an exception for literary titles from Rogers we hope this Court adopts. It doesn't need to because we think there's particularly compelling confusion. But even in the latches context, we cited the restatement of unfair competition that says where there is particularly compelling confusion. You don't even need to look at the three factors of the latches defense because the public interests are paramount in that context. You want to prevent the public from being confused, and that's why the injunctive remedy, which is prospective, overcomes the defense of latches, and that's in the restatement of unfair competition. So we feel that it's the same test in some sense. We overcome it for the First Amendment. We also overcome it for latches. If there are no further questions, we ask that you affirm the judgment of the trial court. Voice of America, I mean, traditionally was this radio network, you know, behind the Iron Curtain, I guess first in World War II, but then behind the Iron Curtain during the Cold War. And so it really only could be heard by people in other countries. And I guess once you got on the web, people obviously can access that website from the United States. Is that how you started to have domestic consumers of the Voice of America essentially? Yeah, so when we filed our registration, the registration was filed in 2005, and it was registered in 2007 at the U.S. Patent Office. One of the areas listed of use is a global computer network. So we were online at that point. To whatever extent there were statutes that restricted domestic distribution, they were available. The internet was available to whoever could see it at that point. Now, those restrictions were removed wholesale in 2013. And, again, that links up with our prospective injunction remedy. If we were asking for economic damages going back to 2009, Mr. Nehmer would probably have a better argument about latches. He doesn't have that here. But, yes, the Voice of America expanded over time. And, you know, there is case law, and, again— Where is it at the most viewers? Are there certain countries where it's really popular now? I mean, during the Cold War, it sort of had a target, I think, at the communist countries in Eastern Europe. But who is it sort of aimed at today? I don't know who it's specifically targeted at, but I do know that there are significant viewership in North Africa. There's significant viewership in other countries, you know, certainly in the area of Yugoslavia after it broke up in the late 1990s. But now I think there's a significant development in North Africa and other parts of Europe as well. But, again, you know, we bring up the point that under this Court's American Rice cases, the targeted audience is unnecessary to look at because all the news is created, it is written, it is analyzed, it is disseminated, and it is produced and post-produced and actually put on the Internet within the United States. And so, you know, as we move forward, the Voice of America certainly did change, but it is available in the United States. There's evidence in the record that it's available on mobile devices right now as an app. And so from moving 2013 forward, there certainly is infringement, there's a crossover of market, and we feel that the injunction should be affirmed. We ask that you affirm the judgment of the trial court. Thank you very much, Your Honor. Thank you, sir. Mr. Jones, if you have some time or a vote. Thank you, Your Honor. Briefly, with regard to his citation to the American Rice cases, the two cases from this court dealing with American Rice, it was a collective of farmers that were putting together their products. Both of them deal with registered trademarks, and what they talk about is whether or not the Lanham Act can extend to infringing activity that takes place in a foreign market. You know, and so their analysis of use in commerce, what it was focused on was the fact that the Lanham Act is coextensive with Congress's own power to regulate commerce between the states and also with other countries. In other words, it's a commerce clause situation. You know, so what they said was that the acts overseas did affect commerce that was within the scope of Congress's power to regulate. Further, yes, they were preparing things in the United States and then sending them abroad. But let's take a moment and consider what the BBG is saying about their own activities. Prior to 2005, they only had common law rights. To the extent that they were recording things in Washington and sending them out, again, that gave them geographically limited scope. All the cases on common law trademark rights talk about the fact that you have to actually be present in the market. You know, you can't own a mark and then not be in the market. So let's say they were in D.C. We don't concede the point, but for the sake of argument, if they were in Washington, D.C., that doesn't affect what Mr. Nehmer was doing in Louisiana. It can't. They're geographically remote. You know, secondly, we would submit that all of our arguments about prior use really undercut everything they're saying about infringement. Their registration of the mark was subject to a good faith concurrent user, Mr. Nehmer. Now, the dismissal of the prior use claim at the district court level was under Rule 12, not Rule 56. What that means is that the Rule 8 standard for pleading, notice pleading, is what controls, not whether or not there's any evidence. Their briefing on the issue of prior use talks about Nehmer not producing any economic evidence and all the rest of that. That's respectfully not the point in contention. The point in contention is whether or not Mr. Nehmer pled facts sufficient to recover, you know, under that defense as a common law prior user. You know, everything that they establish in terms of trying to say that they have seniority depends upon them having the legal right to be there in the first place. You know, so the facts are undisputed and the allegations of petition are clear that Mr. Nehmer was here. The law is clear that they couldn't be here, you know. With regard to their reference to the fact that, oh, the 2013 version of the rule should apply because they're asking for prospective application via injunction, the 2013 rule shouldn't apply because whether or not they comply with statute goes to prior use and it goes to the other issues that we raised, you know. And you have to, not to mention that Congress specifically said that the 2013 version could not be applied until July of 2013. You know, so not only was there the strong presumption that's in all the cases about not applying cases retroactively, not applying statutes retroactively, there's the fact that Congress itself said you couldn't. You know, regardless of the injunction that they're talking about, their limits still go to our right as a good faith prior user. You know, further, the injunction that they are asking the court to do is predicated upon legal error because, again, it assumes that they had trademark rights that weren't subject to any concurrent use. You know, it assumes that they had priority over Nehmer. You know, they keep citing back to, oh, we've been on the air since 1942. That's all fine and good, but that's geographically remote. Under common law, we're talking about international presence. The cases we cited in our brief say that international activity does not suffice to establish domestic priority. You know, in their briefing, they act like we're trying to challenge the registration of the mark by saying there's no use in commerce. That's not what we're saying. We're saying that they didn't establish priority by actual presence. The use in commerce goes to whether or not they're entitled to registration or it would go to whether or not the Lanham Act could apply to the alleged infringement. What we're talking about under common law is whether or not we've got priority, you know, that gives us a shield against their allegations of infringement because any rights that they obtain through registration are subject to the existing rights. You know, a senior user can't come in and push a junior user out of an existing market. Briefly also, they talk about progressive encroachment in their cases. Mr. Nehmer was on the Internet indisputably before they were. There's no way that the Internet could have been their area of natural zone of expansion when he went on the Internet in 1998 because they were, sorry, time is up. Thank you. Thank you, Mr. Jones. That concludes our arguments for today. The court will be adjourned.